# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Boston Scientific Corporation,               Civ. No. 11-419 (SRN/FLN)

                                    Plaintiff,

                                             **MEMORANDUM OPINION
                                             AND ORDER FOR**
v.                                           **PRELIMINARY INJUNCTION**

Marcus Kean and St. Jude
Medical S.C., Inc.,

                                    Defendants.

Eileen M. Hunter, Martin S. Chester, Myriam Pierre Warren and Robert L. Schnell, Jr., Faegre & Benson LLP, 90 South Seventh Street, Suite 2200, Minneapolis, Minnesota 55402, for Plaintiff.

Edward F. Fox and Lauren J. Pugh, Bassford Remele, PA, 33 South Sixth Street, Suite 3800, Minneapolis, Minnesota 55402, and Peter L. Gregory, Lind Jensen Sullivan & Peterson, PA, 150 South Fifth Street, Suite 1700, Minneapolis, Minnesota 55402 , for Defendants.

## INTRODUCTION

Plaintiff Boston Scientific Corporation ("Boston Scientific") has sued its former employee, Marcus Kean, and Kean's new employer, St. Jude Medical S.C., Inc. ("St. Jude"), for breach of contract to enforce a non-competition agreement. Boston Scientific also asserts a claim against St. Jude for tortious interference with contractual relations. Before the Court is Boston Scientific's Motion for a Temporary Restraining Order. Because the Defendants have received notice and the Motion has been fully briefed, the

Court will treat it as a Motion for a Preliminary Injunction pursuant to Fed. R. Civ. P. 65(a).  Oral arguments were heard on March 2, 2011.  For the reasons set forth below, the Court grants the Motion in part.[1]

## BACKGROUND

Defendant Marcus Kean worked as a Cardiac Rhythm Management ("CRM") sales representative for Guidant Sales Corporation ("Guidant"), a wholly-owned subsidiary of Plaintiff Boston Scientific, from February 1, 1999 through January 26, 2011.  As a condition of his employment, he signed a non-compete agreement.   Pursuant to a corporate reorganization, Boston Scientific was assigned Guidant's rights under the contract between Guidant and Kean.  (Declaration of Bruce DeMaro ("DeMaro Decl.") ¶ 12.)   In 2008, Kean entered into a new employment agreement with Boston Scientific, and also signed a new non-compete agreement.   The 2008 non-compete agreement superseded the prior agreement and is the operative agreement in the present dispute.

The non-compete agreement between Kean and Boston Scientific provides:

> During the term of employment and for a period of three hundred sixty five (365) days following the termination of employment with [Boston Scientific][2] for any reason, [Kean] shall not *sell, solicit the sale of, support the sale of, support or supervise the sale or implantation or other use of, or otherwise have any involvement whatsoever with the sale, manufacturing, research and development, marketing or other business aspect of any Competitive Product* with respect to any [Boston Scientific] Account.  It is expressly understood that [Kean] may be employed by a competitor of [Boston Scientific] during the three hundred sixty five (365) days following

---

[1] The following constitutes the Court's findings of fact and conclusions of law, as required by Federal Rules of Civil Procedure 52(a) and 65.

[2] The 2008 non-compete agreement still refers to "GSC," or Guidant, as the employer, and to "GSC Accounts."  The Court has changed these references for "Boston Scientific" to avoid confusion.

termination so long as such employment does not involve the prohibited actions specified above.

* * *

The restrictions contained [above] shall apply regardless of whether [Kean] acts directly or indirectly or whether [Kean] acts personally or as an employee, agent or otherwise for another.

(Non-Compete Agreement, Ex. B § 3 to Amended Declaration of Eileen Hunter ("Hunter Decl.") (emphasis added).)

The agreement applies only to "Competitive Products," which are defined as another company's products which "perform[] similar functions or [are] used for the same general purposes as a [Boston Scientific] Product."  (Id. § 2(a).)  "Competitive Product" is more fully defined as:

> any product, product line or service that has been designed, developed, manufactured, marketed or sold by [Boston Scientific]  which performs similar functions or is used for the same general purposes as a [Boston Scientific] Product which, during the twelve (12) months immediately prior to the termination of [Kean's] employment with [Boston Scientific], [Kean] or persons under [Kean's] supervision sold, solicited the sale of, supported the sale of, supported or supervised the implantation or other use of, or regarding which [Kean] or persons under [Kean's] supervision participated in research and development, clinical testing or engineering, or about which [Kean] obtained Confidential Information.

(Id. § 2(a).)

The non-compete agreement restricts Kean from performing any of the restricted activities involving competitive products with respect to "[Boston Scientific] Accounts," which are defined to include:

> Those physicians, hospitals, clinics, and other persons and entities to whom or for whom, [Kean] . . . sold, solicited the sale of, supported or supervised the sale of, or supported or supervised the implantation or other use of any

3

> [Boston Scientific] Product during the twelve (12) months immediately preceding the termination of [Kean]'s [Boston Scientific] employment. "[Boston Scientific] Account" includes not only the persons and entities themselves, but also those employees, agents, or other affiliated persons involved in the purchase, implantation, or use of any [Boston Scientific] Product.

(Id. § 2(e).)

While working for Boston Scientific, Kean sold CRM devices, including pacemakers, implantable defibrillators, and cardiac resynchronization therapy defibrillators. Such CRM devices provide therapy and are used to treat various heart rhythm disorders. (DeMaro Decl. ¶¶ 2–4.) The technology involved in CRM devices is complex, and the market for them is very competitive; thus, sales representatives must have significant technical and clinical knowledge. (Id. ¶ 7.) Sales representatives like Kean are often in the operating room when physicians implant CRM devices, providing technical assistance to physicians during implantation procedures. (Id.) Boston Scientific and other medical device companies invest extensive time, effort, and expense in training their CRM sales representatives. (Id. ¶ 8.) The principal customers for CRM devices are doctors, and the relationships between sales representatives and doctors are critical to a medical device company's success. (Id. ¶ 9.) When a successful sales representative leaves Boston Scientific, the company often loses sales in the accounts that its former representative served. (Id. ¶ 10.)

In addition to CRM devices, certain medical device companies also manufacture a different device known as an insertable loop recorder ("ILR"). While a CRM device provides therapy and treatment, an ILR, which is also implanted into a patient's chest,

provides electronic diagnostic information.  (DeMaro Decl. ¶ 5.)  It monitors and records

the electronic activity of the patient's heart and is most commonly used with patients

suffering from undiagnosed fainting spells.  (Id.)  An ILR can assist a physician in

determining whether fainting spells are being caused by heart rhythm disorders; if they

are, the disorder is usually treated with a pacemaker or other CRM device.  (Id.)

Because the use of ILRs and CRM devices are often interrelated, Boston Scientific

contends that medical device companies market the ILR to the same customers to whom

they market pacemakers and defibrillators.  (Id. ¶ 6.)   Although Boston Scientific does

not manufacture or sell ILRs (Declaration of Marcus Kean ("Kean Decl.") ¶ 8), it argues

that the scope of Kean's non-compete agreement extends to ILRs, citing this Court's

decision in Boston Scientific v. Duberg, 10-CV-4525 RHK/SRN, 2010 WL 4970022, *6

(D. Minn. Nov. 24, 2010) (finding, in a case in which a former Boston Scientific

employee was sued for breaching her non-compete agreement when she left to work for

rival manufacturer Medtronic, that her sale of Medtronic ILRs to former Boston

Scientific CRM customers constituted a breach of her non-compete agreement).   In this

motion, Boston Scientific therefore seeks injunctive relief that prohibits Kean from

selling ILRs, in addition to CRM devices.

Marcus Kean verbally resigned from Boston Scientific on January 26, 2011, to

accept a position as a sales representative for Defendant St. Jude.  (Id. ¶ 14.)  He

submitted a written letter of resignation two days later, on January 28, 2011.  (Id.)   In

the last year of his employment with Boston Scientific, he sold and promoted

pacemakers, defibrillators, and other CRM devices to customers in and around Kansas

City, Missouri.  After he resigned, Boston Scientific sent him a letter reminding him of his non-compete agreement.  (Letter of 2/3/11 from D. Gerhan to M. Kean, Ex. C to Hunter Decl.)  It listed approximately 74 doctors, nurses and administrators, and 14 hospitals at which he had worked in his last year of employment and which, as a result, were restricted under the agreement, including Menorah Medical Center in Kansas City, Missouri, and Shawnee Medical Center in Shawnee Mission, Kansas.  (Id.)

Legal Counsel for St. Jude responded to Boston Scientific's letter, stating that while Mr. Kean was aware of his post-employment obligations under the non-compete agreement, the agreement was limited to accounts for competing products that he serviced "on more than three occasions for such products during the year prior to separation from [St. Jude]."  (Letter of 2/15/11 from A. Gordon to D. Gerhan, Ex. D to Hunter Decl.)  In response to Plaintiff's motion, Defendants also assert this position, arguing that the non-compete agreement is inapplicable to many of the contested Boston Scientific accounts because of a medical device industry standard which purportedly acknowledges the application of a non-compete agreement only to those customers on whom a device sales person has called upon more than three times in their last year of employment.  (Defs.' Mem. in Opp'n at 5-6.)  Of the 74 doctors, nurses and administrators, and 14 hospitals identified in Boston Scientific's correspondence, St. Jude challenged the application of Kean's non-compete agreement to approximately 28 providers and hospitals, arguing that he did not service these accounts four or more times during his final year of employment with Boston Scientific.  (Letter of 2/15/11 from A. Gordon to D. Gerhan, Ex. D to Hunter Decl.)

6

After having filed the instant motion and after Defendants filed their response, the parties attempted to mediate this dispute.  While they did not ultimately resolve the dispute, they did reach agreement as to the list of providers, hospitals, facilities and employees from which and with whom Defendant Kean is prohibited from making contact with regard to competitive products.   The Court, therefore, will not address this "more than three contacts"/ "four or more contacts" argument, or the application of the non-compete to particular providers and facilities, as these issues are no longer part of the dispute.[3]

Shortly before submitting his resignation to Boston Scientific, Kean communicated with two Boston Scientific employees, Lauren Kinney and Rosie Hannan. On January 25, 2011, Kean phoned Ms. Kinney, telling her that he had decided to join St. Jude.  (Declaration of Lauren Kinney ("Kinney Decl.") ¶ 3.)  When asked what he would be doing for St. Jude, Kean stated that he intended to call on the same accounts that he called on for Boston Scientific.  (Id. ¶ 4.)  Also on January 25, 2011, after receiving a text message from a fellow employee that Kean was leaving Boston Scientific, Ms. Hannan contacted Kean.  (Declaration of Rosie Hannan ("Hannan Decl.") ¶ 3.)  Because she was aware of Boston Scientific's one-year non-compete agreements, Ms. Hannan asked Kean what he would be doing at St. Jude for the next year, to which he responded, 'I don't know – sell loop recorders or something.'  (Id. ¶ 5.)

---

[3] The Court notes, however, that in St. Jude Medical S.C., Inc. v. Ord and Boston Scientific Corp., 09-CV-738 (JNE/JSM), 2009 WL 973275, at *5 (D. Minn. April 10, 2009), when Boston Scientific advocated for the application of a "more than three contacts" industry standard regarding non-compete agreements, this Court declined to give effect to such an understanding, finding it contrary to the plain language of the non-compete agreement itself.

Between January 28, 2011, the date on which Kean formally resigned from Boston Scientific, and February 18, 2011, the date on which the instant motion was filed, Boston Scientific sales representatives and employees observed Kean contacting certain Boston Scientific accounts, which they considered restricted under the terms of Kean's non-compete agreement.  The contacts in question occurred on January 28, February 16 and February 18, 2011.

### A.  January 28, 2011

On January 28, 2011 a "change-out" procedure involving a Boston Scientific CRM was scheduled for 8:00 a.m. at the Menorah Medical Center in Overland Park, Kansas.  (Declaration of Kimberly Dreher ("Dreher Decl.") ¶ 5; Declaration of Kathleen Manning ("Manning Decl.") ¶ 5.)  A change-out procedure occurs when a physician removes a CRM device and replaces it with another.  (Id.)  Boston Scientific employees Kimberly Dreher and Kathleen Manning arrived at the hospital to attend the procedure, as they were responsible for turning off the patient's existing Boston Scientific device before the procedure started, so that the operating physician would not receive an electrical shock.  (Dreher Decl. ¶ 6; Manning Decl. ¶¶  6; 14.)   In the past, Dreher, Manning and Kean had all called upon the referring cardiologist, Dr. Lawrence Cohen, and the electrophysiologist involved in this procedure, Dr. Glenn Polin.  Dreher and Manning considered them to be Boston Scientific customers (Dreher Decl. ¶ 14; Manning Decl. ¶ 13.)

After they arrived at the hospital, catheterization lab staff advised Dreher and Manning that the procedure was delayed because another procedure was taking longer

than anticipated.  (Dreher Decl. ¶ 7; Manning Decl. ¶ 7.)  Later that morning, catheterization lab staff suggested that Dreher and Manning go to lunch and offered to phone them 30 minutes before the start of the procedure.  (Id.)  When Dreher and Manning returned from lunch without receiving any notification from the catheterization lab staff, they were informed that the patient had been moved from the catheterization lab to the operating room and that Dr. Cohen had requested the implantation of a St. Jude CRM device instead of a Boston Scientific device.  (Dreher Decl. ¶ 9; Manning Decl. ¶ 8.)

After Dreher and Manning received this news and were standing in a hospital hallway, they observed Mr. Kean walking out of the operating room, accompanied by the electrophysiologist, Dr. Polin.  (Dreher Decl. ¶ 11.)   Kean was dressed in hospital scrubs, which would typically only be worn when he was participating in a procedure.  (Id.; Manning Decl. ¶ 10.)  As he walked past, he and Ms. Dreher exchanged words, with Dreher attempting to convey that the terms of Kean's non-compete agreement prohibited his presence during the procedure.  (Dreher Decl. ¶12.)  Dreher and Manning then spoke with Dr. Polin, who indicated that before the change-out procedure, he had received a call from Dr. Cohen, the referring cardiologist, who asked that a St. Jude device be implanted instead of a Boston Scientific device.  (Id. ¶ 13; Manning Decl. ¶ 12.)

Mr. Kean provides a slightly different version of the events on January 28, 2011. He explains that because of a close, personal relationship with Dr. Cohen, he telephoned him on January 26, 2011, to relay the news of his move to St. Jude.  (Kean Decl. ¶ 20.) He informed Dr. Cohen that he remained subject to a Boston Scientific non-compete

9

agreement and could not sell or support the sale of St. Jude products.  (<u>Id.</u>)  During the

telephone conversation, Dr. Cohen told Kean that a 92-year-old patient whom Kean had

known for many years was scheduled to undergo a device change-out procedure on

January 28, 2011, and that he expected to see Kean in the operating room to offer support

and reassurance to the patient.  (<u>Id.</u> ¶ 21.)  Dr. Cohen also informed Kean that he had

ordered a change-out to a St. Jude device, instead of a Boston Scientific device.  (<u>Id.</u> ¶

22.)

Kean contends that he attended the patient's procedure not on behalf of St. Jude,

but in his personal capacity, due to his longstanding relationship with patient and the

patient's family.  Another St. Jude CRM sales representative attended the procedure.  (<u>Id.</u>

¶ 24.)  Kean attests that at no time during the procedure "did [he] touch any of the St.

Jude equipment or offer any technical support to Dr. Polin."   (<u>Id.</u> ¶ 23.)  However,

because Ms. Dreher and Manning were not present, "and appeared nowhere to be found,"

Mr. Kean "made the call" to turn off the Boston Scientific device prior to removal.  (<u>Id.</u>)

He was able to do so because he had not yet turned in his Boston Scientific inventory and

still possessed the programmer used to turn off such devices.  (<u>Id.</u>)  Mr. Kean contends

that he did not discuss any St. Jude products with anyone at Menorah Medical Center

before, during or after the procedure and he earned no commissions or other forms of

income from the procedure.  (<u>Id.</u> at ¶ 24.)

### B.  February 16, 2011

The next incident involving a possible violation of the non-compete occurred on

February 16, 2011.  On that day, Boston Scientific employee Kathleen Manning was

calling on a device nurse at the Menorah Medical Center location of Midwest Cardiology

Associates, when Mr. Kean entered the office to speak to the nurse.   (Manning Decl. ¶

16.)   According to Ms. Manning, after Kean and the nurse exchanged greetings, Kean

left.  Ms. Manning considers Midwest Cardiology Associates to be a Boston Scientific

Customer (id. ¶ 19), and Boston Scientific had notified Mr. Kean that Menorah Medical

Center and certain doctors at Midwest Cardiology Associates were Boston Scientific

accounts from which and with whom he was prohibited from making contact with regard

to competitive products.  (Letter of 2/3/11 from D. Gerhan to M. Kean, Ex. C to Hunter

Decl.)

        Kean contends that he did not actually speak with the device nurse, who was on

the telephone at the time he stopped by.  (Kean Decl. ¶ 16.)  Instead, he exchanged

pleasantries with Ms. Manning before leaving because the person responsible for

scheduling meetings with Drs. Sharf, Levi and Nager was not there.  (Id.)  These

particular three doctors at Midwest Cardiology Associates were not on the list of

prohibited contacts identified by Boston Scientific in its February 3, 2011 letter.  (See

Letter of 2/3/11 from D. Gerhan to M. Kean, Ex. C to Hunter Decl.)

### C.  February 18, 2011

        On February 18, 2011, the date on which the instant motion was filed, Kean

appeared at Shawnee Mission Medical Center, a facility that Boston Scientific had

identified as a prohibited facility under the terms of Kean's non-compete agreement.  (Id.

at 2.)  Boston Scientific employees Manning and Dreher were scheduled to participate in

an implantation of a Boston Scientific defibrillator on that day.  (Manning Decl. ¶ 21.)

Two defibrillator implant procedures were to be performed that morning by the same cardiologist and a Boston Scientific implant was to be used for the 9:00 procedure. (Id. ¶ 22.) While waiting for Ms. Dreher to arrive for the procedure, Mr. Kean walked past Ms. Manning and they exchanged greetings. Ms. Manning then observed Kean walking out of the hospital doors as Ms. Dreher walked into the hospital. (Id. ¶ 24.) Ms. Dreher contends that as they walked past each other, Mr. Kean said words to the effect of 'Your cases have been cancelled and switched to St. Jude.' (Dreher Decl. ¶ 22.)

Manning and Dreher proceeded to the catheterization lab at the same time as St. Jude sales representative Tony Anno. (Dreher Decl. ¶ 25; Manning Decl. ¶ 27.) Due to the confusion of having both Boston Scientific and St. Jude staff present, the catheterization lab nurse phoned the cardiologist, Dr. Kiritkumar Masrani. After calling him, the catheterization lab nurse informed Dreher and Manning that Dr. Masrani planned to use a St. Jude device for both of the scheduled defibrillator implant procedures that day. (Dreher Decl. ¶ 28; Manning Decl. ¶ 30.) Mr. Kean had called on Dr. Masrani in the past year and Dreher considered him to be a Boston Scientific customer. (Dreher Decl. ¶ 30.)

Mr. Kean contends that he was present at Shawnee Mission Medical Center on February 18, 2011 in order to obtain training from Mr. Anno on the use of a St. Jude device programmer. (Kean Decl. ¶ 33.) He maintains that they met in the hospital cafeteria for the training session and that he passed both Manning and Dreher as he was leaving the training session. (Id. ¶ 34.) Mr. Kean attests that at no time during this visit did he have any contact with Dr. Masrani or any prohibited Boston Scientific physicians.

(Id. ¶ 35.)  He does acknowledge, however, that he phoned Dr. Masrani on February 11,

2011, to explain that he had resigned from Boston Scientific, noting that he remained

under a non-compete covenant and could not call on him as a CRM sales representative.

(Id. ¶ 36.)

Boston Scientific has filed the instant action alleging that Kean is violating his

non-compete agreement, and now seeks to enjoin Kean from selling or supporting the

sale or implantation of any competitive products, including not only CRM devices but

ILRs as well.

## STANDARD OF DECISION

This Court must consider four factors to determine whether preliminary injunctive

relief is warranted:  (1) the movant's likelihood of success on the merits; (2) the threat of

irreparable harm to the movant in the absence of relief; (3) the balance between that harm

and the harm injunctive relief would cause to the other litigants; and (4) the public

interest.  Dataphase Sys., Inc. v. CL Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en

banc); accord Watkins, Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003) (quoting

Dataphase).  To analyze these factors, the Court must "flexibly weigh the case's

particular circumstances to determine whether the balance of equities so favors the

movant that justice requires the court to intervene."  Hubbard Feeds, Inc. v. Animal Feed

Supplement, Inc., 182 F.3d 598, 601 (8th Cir. 1999).  A preliminary injunction "is an

extraordinary remedy never awarded as a matter of right."  Winter v. Natural Res. Def.

Council, Inc., 555 U.S. 7, 129 S. Ct. 365, 376 (2008).  The burden of establishing the four

Dataphase factors lies with the party seeking injunctive relief.  Watkins, 346 F.3d at 844.

## ANALYSIS

### I.      Likelihood of success

In order to obtain a preliminary injunction, Boston Scientific must show that it has a "fair chance of prevailing" on its claims.  Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 732 (8th Cir. 2008).  "An injunction cannot issue if there is no chance on the merits."  Mid-Am. Real Estate Co. v. Ia. Realty Co., 406 F.3d 969, 972 (8th Cir. 2005).  However, the question is not whether Boston Scientific has "prove[d] a greater than fifty percent likelihood that [it] will prevail," PCTV Gold, Inc. v. SpeedNet, LLC, 508 F.3d 1137, 1143 (8th Cir. 2007), but rather whether any of its claims provide a "fair ground for litigation," Watkins, 346 F.3d at 844.  "In considering the likelihood of the movant prevailing on the merits, a court does not decide whether the movant will ultimately win."  PCTV Gold, 508 F.3d at 1143.  In the Court's view, Boston Scientific has shown sufficient likelihood of success on its claim that Kean violated his non-compete agreement.

The parties do not dispute that Minnesota law governs this action.  Under Minnesota law, employment non-compete agreements are generally disfavored.  Kallock v. Medtronic, Inc., 573 N.W.2d 356, 361 (Minn. 1998).  However, a non-compete will be enforced if it is reasonable and supported by adequate consideration.  Prow v. Medtronic, Inc., 770 F.2d 117, 120 (8th Cir. 1985).

Defendants argue that the non-compete agreement is unenforceable, because it was not supported by independent consideration.  (Defs.' Mem. in Opp'n at 14.)  They contend that Kean signed a new Boston Scientific employment agreement on October 28,

2008 (Employment Agreement, Ex. A at 7 to Hunter Decl.), but did not execute the

separate non-compete agreement until November 28, 2008.  (Non-Compete Agreement,

Ex. B at 6 to Hunter Decl.)  Under Minnesota law, where a restrictive covenant is not

ancillary to the initial employment contract, it must be supported by independent

consideration to be enforceable.  Nat'l Recruiters, Inc. v. Cashman, 323 N.W.2d 736, 740

(Minn.1982).  For purposes of this motion, which requires Plaintiff to show a 'fair chance

of prevailing,' the Court finds that Boston Scientific has sufficiently shown the existence

of an enforceable contract.   As a condition of his initial employment with Boston

Scientific's corporate predecessor, Guidant, Kean was required to sign a non-compete

agreement.  (DeMaro Decl. ¶ 13.)   In 2008, when the corporate identity changed from

Guidant to Boston Scientific, Kean entered into the operative employment contract and

non-compete agreement.  (Id. ¶ 12.)  While Kean argues that he did not execute the 2008

non-compete agreement until November 28, 2008, one month after he signed the

employment agreement on October 24, 2008, his employer did not execute the

employment agreement until December 3, 2008.  (See Employment Agreement, Ex. A at

7 to Hunter Decl.)  Regardless of the sequence of events, by signing the non-compete

agreement, Kean acknowledged that Boston Scientific's offer of "continuing

employment, [Kean's] other benefits associated with such employment, such as bonuses,

and [Kean's] being given access to Confidential Information" constituted "good and

valuable consideration."  (Non-Compete Agreement, Ex. B at 1 to Hunter Decl.)

Moreover, the parties' intent, as evidenced by their actions in attempting to resolve the

instant dispute under the terms of the agreements, supports the finding of an enforceable non-compete contract, for purposes of this motion.

To determine if a non-compete agreement is reasonable, the Court considers: (1) whether the restraint is necessary for the protection of the business or goodwill of the employer; (2) whether the restraint is greater than necessary to adequately protect the employer's legitimate interests; (3) how long the restriction lasts; and (4) the geographic scope of the restriction.  Id. (citing Bennett v. Storz Broadcasting Co., 134 N.W.2d 892, 899 (1965)).

Courts have repeatedly recognized that non-compete agreements in the medical device industry serve employers' important and legitimate interests in long-term customer relationships and preserving goodwill.  Duberg, 2010 WL 4970022, at *5; Guidant Sales Corp. v. Niebur, 01-CV-1772 (DWF/AJB), 2001 WL 1636502, at *7 (D. Minn. Oct. 18, 2001); accord, e.g., Prow, 770 F.3d at 117; Medtronic, Inc. v. Gibbons, 527 F. Supp. 1085 (D. Minn. 1981), aff'd 684 F.2d 565 (8th Cir. 1982).  Indeed, the Court "has consistently found one-year restrictions that are limited to a former employee's sales area to be reasonable."  Guidant Sales Corp. v. Baer, No. 09-CV-0358 (PJS/FLN), 2009 WL 490052, at *4 (D. Minn. Feb. 26, 2009).

As in Duberg and Baer, the non-compete in this case is narrowly drawn because it applies only to customers with whom Kean "sold, solicited the sale of, supported or supervised the sale of, or supported or supervised the implantation of any [Boston Scientific] product in the year preceding the termination of his employment."  Id.  Kean's

non-compete is reasonable in both temporal and geographic scope, and by its plain

language, applies to competitive CRM devices.

As to whether the non-compete applies to the sale of ILRs at St. Jude, Boston

Scientific cites to this Court's decision in Duberg.  (Pl.'s Mem. at 3.)  However, the facts

of this case are different from Duberg.   In Duberg, this Court addressed ILRs because

Ms. Duberg, a former Boston Scientific employee, was engaged in the sale of ILRs with

her new employer, Medtronic.  Duberg, 2010 WL 4970022, at * 3.  Here, Kean has not

received training on ILRs at St. Jude, nor marketed or sold any ILR devices on their

behalf, because he is not qualified to do so without training.  (Kean Decl. ¶ 8.)   Duberg

argued that as a Medtronic employee, she sold only ILRs to restricted Boston Scientific

accounts, and not CRM devices, but this Court found that because of the significant

overlap in sales between CRM devices and ILRs, Duberg's continued contact with her

former Boston Scientific contacts supported the sale of competitive Medtronic products,

in violation of her non-compete agreement.  Id. at *6.  Given this factual distinction, in

this case, the Court will not opine on the application of the non-compete agreement to the

sale of ILRs, any more than the sale of any other diagnostic tool used to diagnose a heart

condition, because they simply are not at issue.  Because this issue is not ripe for

adjudication, the Court declines to issue an advisory opinion with respect to ILRs.

Turning to the question of Plaintiff's likelihood of success in proving a breach of

the non-compete agreement, Boston Scientific asserts that Kean violated the agreement

by selling, supporting or supervising the implantation of competitive CRM devices with

respect to his restricted accounts on at least three occasions:  January 28, February 16 and

February 18, 2011.[4]  Most troubling to the Court is the January 28 incident, recounted by

Ms. Manning, Ms. Dreher, and even Mr. Kean himself.  On that date, Kean was present,

dressed in scrubs and in the operating room when a Boston Scientific device was to be

changed out at Menorah Medical Center, in a case involving Dr. Polin and Dr. Cohen –

all Boston Scientific accounts serviced by Mr. Kean.  Boston Scientific staff arrived to

assist with the change-out to a new Boston Scientific device.  After having been sent

away by hospital staff, Ms. Manning and Ms. Dreher later returned to find that the

procedure was underway and that Dr. Cohen had instead ordered the implantation of a St.

Jude device.   (Manning Decl. ¶¶ 8-12; Dreher Decl. ¶¶ 9-13.)

While Mr. Kean avers that he was simply present to support a long-time patient

and his family, the facts demonstrate his active participation in the removal of the device.

Kean turned off the Boston Scientific device prior to its removal because Dreher and

Manning were "nowhere to be found," and, conveniently, Kean still had a Boston

Scientific programmer in his possession.  (Kean Decl. ¶ 23.)  After the procedure, he

sought out the patient's wife to offer support.  (Id. ¶ 24.)  His mere presence during this

change-out procedure, to say nothing of his actual participation, may be considered a

violation of the non-compete, which prohibits Kean from "support[ing] or supervis[ing]

the implantation of" any competitive product with respect to any Boston Scientific

account with which he worked during the preceding twelve months.  (Non-Compete

Agreement, Ex. B § 3 to Hunter Decl.)  Furthermore, the terms of the non-compete

---

[4] Plaintiff initially argued that a fourth contact, occurring on February 6, 2011, constituted a
breach of the non-compete agreement.  However, following discussion between the parties, that
incident no longer forms part of the factual basis for the instant motion.

agreement make clear that "support or supervision of implantation" includes "all acts in furtherance of implantation," including, but not limited to acts or services such as "*attendance at implantation*" and "follow-up with patients."  (Id. §2(h)) (emphasis added).  Moreover, the restrictions of the non-compete apply whether the employee "acts directly or indirectly," or whether he "*acts personally* or as an employee. . . ."  (Id. ¶ 3) (emphasis added).

While Kean argues that as of January 28, 2011, he had not received formal notice that Boston Scientific considered the Menorah Medical Center, Drs. Polin and Cohen to be prohibited accounts, his own knowledge and experience with those customers should have informed his actions.  Moreover, it is hardly surprising that Boston Scientific had not provided formal notice to him on January 28, 2011, because it was on that very date that Kean officially resigned from Boston Scientific.  (DeMaro Decl. ¶ 14.)   In sum, the Court finds that with respect to the January 28, 2011 incident, Boston Scientific has demonstrated a likelihood of success in establishing that Kean breached the terms of his non-compete agreement.

As to the February 16, 2011 incident in which Mr. Kean appeared at the Menorah Medical Center office of Midwest Cardiology Associates, the Court finds that Plaintiff has not demonstrated a likelihood of success in establishing that Kean breached the terms of his non-compete agreement.  In this instance, Kean stopped by to schedule an appointment with three doctors, although he was not able to do so because the staff member responsible for scheduling was not present.  (Kean Decl. ¶ 16.) While Menorah Medical Center was on the list of prohibited accounts, and while certain physicians in the

Midwest Cardiology Associates practice group were also on the list, the doctors identified by Mr. Kean – Drs. Scharf, Levi and Nager – were not on the list of prohibited accounts.  (See Letter of 2/3/11 from D. Gerhan to M. Kean, Ex. C to Hunter Decl.)  Thus, the record before the Court does not support an inference that Mr. Kean intended to violate the terms of his non-compete agreement with respect to this incident.  Moreover, it appears from the declarations provided by both Mr. Kean and Ms. Manning that any interactions that Mr. Kean may have had with the Midwest Cardiology device nurse on February 16 were minimal.  (Kean Decl. ¶ 16; Manning Decl. ¶¶ 16-19.)

As to the last incident, occurring on February 18, 2011, the Court finds that Plaintiff has submitted enough evidence to demonstrate a likelihood of success in establishing a breach of the non-compete agreement.  On that date, Mr. Kean was at Shawnee Mission Medical Center, a prohibited account, when a scheduled Boston Scientific change-out procedure was switched to a St. Jude device.   Prior to this occasion, the physician involved in the procedure, Dr. Masrani, had used Boston Scientific devices for 100% of his procedures.   While Kean claims that he was merely at Shawnee Mission Medical Center in order to receive training from his St. Jude colleague, Tony Anno (Kean Decl. ¶ 33), upon seeing Ms. Dreher, he said words to the effect of 'Your cases have been cancelled and switched to St. Jude.'  (Dreher Decl. ¶ 22.)

For the first time, on February 18, 2011, Dr. Masrani switched from using a Boston Scientific device to a St. Jude device, with no advance notice to Boston Scientific's employees Manning and Dreher, and Mr. Kean happened to be on-site, casually informing Ms. Dreher that her accounts had been switched to St. Jude.  The non-

compete agreement prohibits soliciting or supporting the sale of, "*or otherwise hav[ing] any involvement whatsoever* with the sale, manufacturing, research and development, marketing or other business aspect of any [competitive product.]"  (Non-Compete Agreement, Ex. B § 3 to Hunter Decl.) (emphasis added).  Again, the non-compete applies whether the employee acts "directly or indirectly."  (Id.)  Although this is a closer call than the January 28 incident, Boston Scientific has arguably submitted enough evidence to establish a likelihood of success of showing that Kean breached the terms of his non-compete agreement.

## II.   Irreparable harm

"The basis of injunctive relief in the federal courts has always been irreparable harm and the inadequacy of legal remedies."  Bandag, Inc. v. Jack's Tire & Oil, Inc., 190 F.3d 924, 926 (8th Cir. 1999) (*per curiam*) (quoting Beacon Theaters, Inc. v. Westover, 359 U.S. 500, 506–07 (1959)).  "Thus, to warrant a preliminary injunction, the moving party must demonstrate a sufficient threat of irreparable harm."  Id.; accord, e.g., Winter, 129 S. Ct. at 375–76.  In the Court's view, Boston Scientific has shown a sufficient threat of irreparable harm here.

"Minnesota courts have consistently held that '[i]rreparable harm may be inferred from breach of a valid non-compete agreement if the former employee obtained a personal hold on the good will of the former employer.'"  Duberg, 2010 WL 4970022, at *7 (citing St. Jude Med. S.C., Inc. v. Ord, Civ. No. 09-738 (JNE/JSM), 2009 WL 973275, at *5 (D. Minn. Apr. 10, 2009); accord Baer, 2009 WL 490052, at *6.)  As Boston Scientific explains, the clientele for its medical devices is highly sophisticated, requiring

representatives to have deep sales, technical, and clinical knowledge in order to successfully market and sell the company's devices.  (DeMaro Decl. ¶ 8.)  Long-term customer relationships are crucial to the success of a sales representative and the company whose products he sells.  (Id. ¶ 9.)  In fact, relationships between a representative and doctors are so vital that Boston Scientific "devotes substantial time, effort, and expense to have its sales representatives establish and maintain the trust of customers and potential customers."  (Id. ¶ 10.)

As this Court has recognized, "[b]ecause customer relationships were developed over significant time periods with substantial investment of [Boston Scientific] training sessions and clinical support, its interest is substantial." Duberg, 2010 WL 4970022, at *7 (citing Niebur, 2001 WL 1636502, at *8 (finding irreparable harm)).  Given the importance of customer relationships and good will to its business, if no restraint is imposed, then Boston Scientific will likely lose valuable business relationships in the limited market of Kansas City, Missouri.  See id.  The Court is satisfied that, as a result of his work with Boston Scientific, Kean is the beneficiary of the good will of Boston Scientific's customers and that Boston Scientific faces irreparable harm from continued non-compete violations by Kean.  Id.; see also Ord, 2009 WL 973275, at *5.

## III.   The remaining factors

In addition to showing a likelihood of success on the merits and irreparable harm, Boston Scientific must also establish that the balance of harms and public interest favor granting preliminary injunctive relief.

The possibility of harm to Kean if preliminary injunctive relief is granted is minimal compared to the irreparable harm Boston Scientific faces if he has indeed violated his non-compete agreement.  Kean may still sell CRM devices to doctors and hospitals that are outside his restricted accounts.  Although not selling CRMs to his old clients may result in a less successful year in sales, the restriction is for a one-year period, and Mr. Kean's first year of scheduled compensation at St. Jude is not in any way dependent on sales or a transfer of any accounts from Boston Scientific to St. Jude. (Kean Decl. ¶ 6.)  As this Court found in Duberg, when a sales representative leaves one medical device company to accept employment at another and receives some guaranteed compensation during the first year of his new employment, as is the case here, the balance of harms favors the moving party.  Duberg, 2010 WL 4970022, at *7 (citing Baer, 2009 WL 490052, at *7 ("Given that Baer's compensation is guaranteed regardless of the outcome of Guidant's motion, the balance of harms tilts strongly in Guidant's favor); Niebur, 2001 WL 1636502, at *8.))

Moreover, Minnesota courts have repeatedly found that "the public interest favors the enforcement of valid business agreements and the protection of legitimate business interests in an industry propelled by vigorous but fair competition."  Niebur, 2001 WL 1636502, at *8; accord Ord, 2009 WL 973275, at *6 ("[T]he public interest is served by upholding parties' contractual obligations, and Minnesota law permits use of non-compete agreements to protect an employer's goodwill.") (internal citations omitted); Baer, 2009 WL 490052, at *7 (same).

## CONCLUSION

The Court finds that each of the factors discussed above weighs in favor of granting Boston Scientific's Motion and enjoining Kean from continuing to engage in conduct likely prohibited by his non-compete agreement.

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED**:

1. Boston Scientific's Motion for a Temporary Restraining Order (Doc. No. 2) is **GRANTED** in part, and **DENIED** in part;

2. Defendant Marcus Kean is **ENJOINED**, from the effective date of this Injunction until January 28, 2012 (one year from the date he left Boston Scientific), from selling, soliciting the sale of, supporting the sale of, supporting or supervising the sale or implantation or other use of, or otherwise having any involvement whatsoever with the sale, manufacturing, research and development, marketing or other business aspect of any Competitive Product, with respect to any GSC Account, including but not limited to each of the physicians, clinics, hospitals, facilities, and employees listed below:

**Hospitals / Facilities / Employees**

1. Cushing Memorial Hospital

2. Heartland Regional Medical Center

3. Overland Park Regional Medical Center

4. Liberty Hospital

5. Phillip Moore, *Cardiac Cardiovascular Director Liberty Hospital*

6. Joel Winger, *Cardiac Cath Lab Manager Liberty Hospital*

7.  Menorah Medical Center

8.  Olathe Medical Center

9.  Alan McPherson, *Administrator Olathe Medical Center*

10. Shawnee Mission Medical Center

11. St. John's Hospital

12. Kansas City VA Medical Center

13. Centerpoint Medical Center

**Physicians / Practice Groups / Employees (listed by current affiliation, if any)**

14. Heart Health PA

15. Cardiology Services

16. Midwest Cardiology Associates

17. Liberty Cardiovascular Specialists

18. Heartland Cardiovascular Consultants

19. Overland Park Cardiovascular Inc.

20. Sunflower Medical Group

21. Kiritkumar Masrani MD – *Heart Health PA*

22. David Robbins MD – *Heart Health PA*

23. Jenae Carlson NP – *Heart Health PA*

24. Shelley [unknown] (Pacemaker Tech at Heart Health PA) – *Heart Health PA*

25. All Advanced Registered Nurse Practitioners – *Heart Health PA*

26. Rangarao Tummala MD – *Cardiology Services*

27. Ravi Yarlagadda MD – *Cardiology Services*

28. Rick Brown MD – *Cardiology Services*

29. Jim Markum MD – *Cardiology Services*

30. Roger Freidman MD – *Cardiology Services*

31. Nursing Administrators – *Cardiology Services*

32. Nikki Chapman RN – *Cardiology Services*

33. Mary Zeller RN – *Cardiology Services*

34. Linda Kerster, ARNP – *Cardiology Services*

35. Gloria Hiller RN – *Cardiology Services*

36. Carol Powell, Administrator – *Cardiology Services*

37. Glenn Polin MD – *Midwest Cardiology Associates*

38. Peter Park MD – *Midwest Cardiology Associates*

39. Chandrasekhar Vasamreddy MD – *Midwest Cardiology Associates*

40. Sandy Sosa RN – *Midwest Cardiology Associates*

41. April Zawoski RN – *Midwest Cardiology Associates*

42. Carrie Ureker RN – *Midwest Cardiology Associates*

43. Sarah Jensen – *Midwest Cardiology Associates*

44. Josea [unknown] (Pacemaker Tech) – *Midwest Cardiology Associates*

45. Paul Kramer MD – *Liberty Cardiovascular Specialists*

46. Venkat Pasnoori MD – *Liberty Cardiovascular Specialists*

47. Demetrio Maragos MD – *Liberty Cardiovascular Specialists*

48. Kimberly Jackson RN – *Liberty Cardiovascular Specialists*

49. Paulette Scherrer, Administrator – *Liberty Cardiovascular Specialists*

50. Mohan Hindupur MD – *Heartland Cardiovascular Consultants*

51. Ricardo Ramos MD – *Heartland Cardiovascular Consultants*

52. Francisco Lammoglia MD – *Heartland Cardiovascular Consultants*

53. Robert Grant, DO – *Heartland Cardiovascular Consultants*

54. Judy Edwards – *Heartland Cardiovascular Consultants*

55. Julian Nunez MD – *Cardiovascular Inc.*

56. George Pierson MD – *Cardiovascular Inc.*

57. Michael Sweeney MD – *Cardiovascular Inc.*

58. Lawrence Cohen MD

3.  "GSC Account" and "Competitive Product" shall have the meanings as provided in Kean's Agreement Regarding Non-Disclosure of Confidential Information, Non-Competition and Ownership of Intellectual Property, which is attached as Exhibit B to the Complaint in this action;

4.  Defendant St. Jude Medical S.C., Inc. is enjoined from interfering with the contractual relationship between Boston Scientific and Marcus Kean;

5.  The restrictions contained within Paragraph 2 of this Order shall apply regardless of whether Defendant Kean acts directly or indirectly or whether Defendant Kean acts personally or as an employee, agent or otherwise for another;

6.  This Order is binding upon Defendants, as well as their affiliates, successors, assigns, agents, servants, employees, representatives, and any persons in active concert or participation with them.

7.  Boston Scientific is **ORDERED** to file a bond in the amount of $100,000.  The Injunction in Paragraph 2 will take effect upon the filing of this bond.


Dated: March 9, 2011                          s/Susan Richard Nelson
                                              SUSAN RICHARD NELSON
                                              United States District Judge